UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


AMI L. BERNAL, et al., on behalf
of themselves and others similarly
situated,

      Plaintiffs,

v.                                                          CASE NO. 1:08-CV-508

TRUEBLUE, INC., a Washington          HON. ROBERT HOLMES BELL
corporation, LABOR READY, INC.,
a Washington corporation, and LABOR
READY MIDWEST, INC., a
Washington corporation,

      Defendants.
_____/


## OPINION

    This is a putative collective action brought by seven[1] current or former employees of

Defendants Trueblue, Inc., Labor Ready, Inc., and Labor Ready Midwest, Inc. (collectively

"Labor Ready") pursuant to the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201

et seq., and the Michigan Minimum Wage Law ("MWL"), Mich. Comp. Laws § 408.381 et

seq.  On November 4, 2008, Plaintiffs filed a motion to approve notice to similarly situated

---

    [1]Plaintiffs' second amended complaint (Dkt. No. 58) states that the action is brought on
behalf of the seven Plaintiffs named in the caption, and "other current and former employees of
Labor Ready" who have filed consent-to-join forms.  However, Rule 10 of the Federal Rules of
Civil Procedure states that "[t]he title of the complaint must name all the parties."  Thus, only the
seven individuals named in the caption of Plaintiffs' complaint are considered Plaintiffs for
purposes of this opinion.

individuals (Dkt. No. 18), and on November 7, 2008, Plaintiffs filed a motion to certify a class of all "past and present temporary employees of Labor Ready who worked at various branch offices in Michigan at any time since May 30, 2002 to September 30, 2006." (Dkt. No. 20.) On August 26, 2009, Labor Ready filed a motion for summary judgment on Plaintiffs' claims. (Dkt. No. 45.) Because, in the interest of conserving resources, a court may consider a motion for summary judgment prior to considering a motion for collective action certification, *see Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 616 (6th Cir. 2002), this opinion addresses Labor Ready's motion for summary judgment. For the reasons that follow, Labor Ready's motion will be granted.

### I. Factual Background

Labor Ready is a temporary employment service that provides human labor, or "employees," to businesses in need, or "customers." Though employees perform work for and subject to the supervision of customers, they are employees of, and paid by, Labor Ready, not the customers. Labor Ready's revenue derives from the difference between the hourly rate at which it charges customers for use of employees' services, and the hourly rate at which it pays employees. This action stems from Labor Ready's practice of paying employees only for time spent working at a customer's location, and not for time before arrival to and after departure from a customer's location.

As with most jobs, prospective Labor Ready employees must complete an employment application. Labor Ready verifies that the applicant is authorized to work in the

United States and is otherwise qualified prior to extending the applicant an employment offer. Applicants that are given an employment offer are not automatically entitled to specific working hours or a regular paycheck; rather, they are merely added to Labor Ready's eligible workforce, and permitted to request jobs as customers make them available.

Labor Ready employs a so-called "best fit" policy in determining which employee to select to fill a customer's work order. Occasionally, Labor Ready will seek out a particular employee to fill a position. More commonly, Labor Ready selects an employee from a list of employees that "register" to work on the day that work is available.

To register, an employee must appear in person and sign in at a regional Labor Ready dispatch office. Though many do so early in the morning, employees can register at anytime throughout the day, and they are considered for any jobs that become available after they register.[2] Though registration does not guarantee an employee a job, it also does not require employees to accept jobs that are offered to them, nor does it require them to remain in the Labor Ready dispatch office or perform any specific tasks while they are there. Plaintiffs testified that, while waiting for an assignment, they were free to watch television, socialize with other workers, read, use the restroom, and even leave the dispatch office and return at their own convenience, if at all. (*E.g.*, Dkt. No. 46, Ex. B, Gibbs Dep., 80, 137-41.) Pursuant to the "best-fit" policy, Labor Ready reserves the right to prefer employees physically present in the office to those that are not in deciding who to select for a job.

---

[2]There is some evidence that employees were only considered for jobs that became available one-hour or more after registration, though the evidence is conflicting on this point.

Employees that are given an assignment are expected to arrive at the customer's location prior to the start of the job. The record, however, reveals significant variations from employee to employee and from day to day in the experiences of employees after they accept a work assignment and before they begin work at a customer's location. For each assignment, the customer is required to complete and return to Labor Ready a "work ticket" on behalf of the employee, which is Labor Ready's means of tracking hours worked and payment. If an assignment is expected to last more than one day, Labor Ready issues a "repeat work ticket" which collects information from each day of a multi-day assignment and excuses an employee from having to procure a work ticket on any day covered by the repeat work ticket. If an assignment is not expected to last more than one day, the daily issuance of a separate work ticket is required. Occasionally, Labor Ready will fax the work ticket to the customer, or have a Labor Ready representative drop it off. More commonly, however, Labor Ready will simply provide the work ticket to the employee that accepts the assignment, and have that employee deliver it directly to the customer at the start of the job.

Employees charged with transporting the work ticket either receive the work ticket from Labor Ready at the time they accept their assignment, or make a special trip to Labor Ready to retrieve the work ticket sometime after accepting the assignment but before the start of the job. However, whether to receive an assignment, pick up a work ticket, or both, in most cases Labor Ready employees are required to be physically present in the Labor Ready office at least one-hour before the start of the job. Although this "one-hour reporting

requirement" appears to be primarily intended to allow Labor Ready to ensure that an employee has been given a work ticket and has sufficient time to commute to a job, Labor Ready also uses this time to "make sure the employees know where they are going," "describe the job," and provide employees with any necessary equipment. (Dkt. No. 50, Ex. A-1, 52.) Labor Ready also uses employees' presence in the office as an opportunity to coordinate rides among employees working at the same or similar locations.

After an employee has been given a work ticket and otherwise cleared for departure, a process known as "dispatch," the employee is free to use the time between dispatch and the start of the job in any manner desired. Dispatched employees may stop for gas and/or a meal on their way to a job site, and employees that have been dispatched several hours to a full day prior to the start of their job can go home, eat, and sleep before traveling to the customer's location. Labor Ready requests only that the employee arrive at the customer's location at the time indicated on the work ticket.

Sometime after completing an assignment, employees are required to return to the appropriate Labor Ready dispatch office, sign out, file the completed work ticket, and collect payment. Employees have the option of returning to the dispatch office immediately following completion of an assignment, but they are not required to do so. Employees often wait several days before returning to the office to sign out and collect payment.

Plaintiffs claim that they should have been paid for time spent waiting in a Labor Ready dispatch office prior and subsequent to receiving an assignment, as well as time spent

traveling to and from a customer's location prior and subsequent to completing an assignment. Plaintiffs claim that, by not compensating them for waiting and travel time, Labor Ready paid Plaintiffs an hourly fee below minimum wage, and that Labor Ready was able to avoid paying Plaintiffs for overtime in violation of the FLSA and MWL.

## II. Law and Analysis

Labor Ready is entitled to summary judgment on Plaintiffs' claims if the pleadings and affidavits "show that there is no genuine issue as to any material fact and that [Labor Ready] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). To withstand a motion for summary judgment, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Labor Ready moves for summary judgment on the ground that, as a matter of law, it is not required to compensate its employees for waiting and travel time. Whether an employer must compensate for waiting time involves a similar but different legal analysis than whether an employer must compensate for travel time.

### A. Waiting Time

Under both federal and state law,[3] all employers, including Labor Ready, must pay their employees no less than a statutorily defined rate for each hour that the employer "suffer[s] or permit[s]" the employees to work. 29 U.S.C. §§ 206, 203(g); Mich. Comp.

---

[3]The parties agree that, because the language of the MWL mirrors that of the FLSA, the MWL should be interpreted like the FLSA. *Fakouri v. Pizza Hut of Am., Inc.*, 824 F.2d 470, 474 (6th Cir. 1987).

Laws §§ 408.383, 382(d). An employer does not suffer or permit an employee to work unless the employee is engaged in the "principal activity of employment." 29 U.S.C. § 254. Waiting time can be considered part of the principal activity of employment. *Chao v. Akron Insulation & Supply, Inc.*, 184 F. App'x 508, 511 (6th Cir. 2006) (unpublished); *Vega v. Gasper*, 36 F.3d 417, 425 (5th Cir. 1994) (citing 29 U.S.C. § 254). Waiting time is part of the principal activity of employment if the workers are "engaged to wait" rather than "waiting to be engaged." 29 C.F.R. §§ 785.14-.16. In determining whether an employee is engaged to wait, or waiting to be engaged, the critical inquiry is whether the time spent waiting is primarily for the benefit of employer or the employee. *See Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944); *Chao*, 184 Fed. App'x at 511; *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 609 (6th Cir. 1992); *F.W. Stock & Sons, Inc. v. Thompson*, 194 F.2d 493, 496-97 (6th Cir. 1952); *accord Birdwell v. City of Gadsden*, 970 F.2d 802, 807 (11th Cir. 1992); *Halferty v. Pulse Drug Co., Inc.*, 864 F.2d 1185, 1189 (5th Cir. 1989); *Leverette v. Labor Works Intern., LLC*, 636 S.E.2d 258, 263 (N.C. Ct. App. 2006).

Whether waiting time is for the benefit of the employer or the employee depends on all the circumstances of the case. *Armour*, 323 U.S. at 133; *Skidmore v. Swift*, 323 U.S. 134, 136-37 (1944); 29 C.F.R. § 785.14. Nevertheless, courts consider several non-controlling and non-exhaustive factors in determining whether waiting time is predominately for the benefit of the employer or employee. First, courts consider whether the agreements and understandings between the employer and employee indicate that waiting time will be

compensated.[4] *Skidmore*, 323 U.S. at 137; 29 C.F.R. § 785.14. Second, courts consider

whether the employer requested or required that the employee wait. *Vega*, 36 F.3d at 426

("Waiting benefits the employer when it is requested or required by the employer."); *Irwin*

*v. Clark*, 400 F.2d 882, 883-84 (9th Cir. 1968). Third, courts consider the extent to which

an employee's free will is constrained during the waiting time. *Birdwell v. City of Gadsden*,

970 F.2d 802, 807 (11th Cir. 1992) ("The question of whether the employees are working

during this time for purposes of the FLSA depends on the degree to which the employee may

use the time for personal activities."); *Halferty v. Pulse Drug Co., Inc.*, 864 F.2d 1185, 1189-

90 (5th Cir. 1989) ("[T]he critical issue in determining whether an employee should receive

compensation for idle time is whether the employee can use the time effectively for his or her

own purposes."); 29 C.F.R. § 785.14-.17. Finally, courts consider the extent to which the

employer actually benefits from the waiting time. *See, e.g., Irwin v. Clark*, 400 F.2d 882,

883 (9th Cir. 1968) (finding waiting time non-compensable where, "while thus waiting, the

plaintiffs performed no services for the employer").

*1. The Agreements and Understandings*

The agreements and understandings between the parties clearly indicate that time

spent in the Labor Ready office prior to the start of an assignment, whether before or after

---

[4]The Department of Labor ("DOL") regulations governing temporary labor services
provide that waiting time is not compensable "[i]f the employment understanding clearly is that
the pay or the time of the employee begins and ends at the customer's establishment."
Department of Labor, Wage and Hour Division's Field Operations Handbook § 31c09. The DOL
regulations are not binding, but courts may consider them. *Hill v. United States*, 751 F.2d 810,
813 (6th Cir. 1984).

the employee accepted the assignment, would not be compensated. The Labor Ready employment application, which all Plaintiffs signed, contains provisions stating: "I [the employee] understand that I will not be paid for time I spend in a Labor Ready branch office," and "I understand that I will not be paid for time spent at a Labor Ready branch office after receiving a job assignment." (Dkt. No. 46, Exs. A(1), A(2).) Additionally, several Plaintiffs explicitly acknowledged that, as they understood Labor Ready's business model, they would begin to be paid only upon their arrival at the customer's location. (*Id.* Ex. C, Gildner Dep. 61-62, Ex. D, McNeal Dep. 51.)

*2. Whether Waiting was Requested or Required*

The day-to-day decision to seek an assignment is always reserved solely to the discretion of the employee. The employment application makes clear that: "I understand that I am not required to work on any particular day and whether I report to a Labor Ready branch office is always my choice." (Dkt. No. 46, Def.'s Mot. Exs. A(1), A(2).) It also provides: "I understand that I am free to leave the dispatch office at any time." (*Id.*) The remaining evidence indicates that Labor Ready's practice was entirely consistent with this policy. Employees acknowledged that they were never under an obligation to make themselves available for an assignment. Some employees would go several years without reporting to Labor Ready after their employment applications were accepted, but they were always welcome back when they decided it was time to again begin seeking jobs.

In this sense, waiting in the Labor Ready office is never requested or required. It is

an employee's own desire to work that drives his or her decision to register for work, not a requirement or request imposed by Labor Ready. If an employee does desire to seek work, Labor Ready encourages him or her to wait in the Labor Ready office by reserving the right to prefer employees that are physically present in the office, and thus demonstrably ready, willing, and able to work, to those that are not in delegating assignments. (Dkt. No. 46, Ex. A (employment application) ("I understand that . . . I have a better opportunity for work if I am present when a job assignment is called.").) The use of economic incentives, such as the increased likelihood of being hired, to encourage waiting has been called "economic compulsion." *Irwin v. Clark*, 400 F.2d 882 (9th Cir. 1968). Courts have held that economic compulsion should be considered in determining whether waiting is for the benefit of the employer. *Id.* at 884. However, in this case Labor Ready's policy of preferring present employees actually preserves Labor Ready's policy of permitting employees to seek work only when they desire. By encouraging employees seeking an assignment to appear in the office, Labor Ready is also able to identify those employees that are *not* seeking work, and to accordingly respect this decision. Even if Labor Ready's policy of encouraging employees to wait for assignments is somehow motivated by its own self-interest, economic compulsion, though a consideration, does not control whether waiting is for the benefit of the employer or employee, and other factors should be weighed against it. *Id.*

After an employee receives an assignment and is "dispatched," a process that generally occurs at least one-hour before the start of a job, the employee is not required, or

even encouraged, to wait, or subject to any other control measures imposed by Labor Ready prior to the start of the job. If an employee is not given a work ticket at the same time he or she is given an assignment, which may occur if the assignment is given by phone or several hours or days prior to the start of a job, the employee is occasionally required to return to the Labor Ready office to retrieve a work ticket. However, these infrequent, special-purpose trips are merely an incident of an employee's decision to declare himself work-eligible, they require no waiting, and Labor Ready presents evidence that they can be avoided altogether by having the work ticket faxed or delivered by a Labor Ready employee to the customer.

*3. The Employee's Free Will While Waiting*

If an employee decides to wait for an assignment, it is undisputed that he or she is permitted to use that time any way he or she wants. While waiting, employees can watch television, socialize with other workers, read, use the restroom, drink coffee, and smoke cigarettes. In addition, the employment application permits employees "to leave the dispatch office at any time," and employees that take advantage of this right are permitted to return to the dispatch office at their leisure and resume their pursuit of employment. (Dkt. No. 46, Ex. A.) Labor Ready exerts no control over the employees during this time period.

An employee's free will is similarly unrestrained after the employee is given an assignment and dispatched. The employment application provides: "I understand that after receiving a job assignment I am free to leave the branch office and do as I wish until the job assignment starts." (*Id.*) The record indicates that Labor Ready's practice follows its policy.

After dispatch, employees are permitted to stop for gas, stop for food, or otherwise use the time in any manner they wish, as long as they report to the customer's location at the required time.

*4. The Actual Benefit to the Employer*

Plaintiffs cite two alleged benefits to Labor Ready resulting from the physical presence of employees in the dispatch office. However, neither of these benefits are sufficient to convince the Court that the employees' wait time is predominantly for the benefit of Labor Ready as opposed to the employees.

First, Plaintiffs argue that employees' waiting ensures that Labor Ready has access at all times to a ready and willing supply of employees, which permits Labor Ready to promptly fill customer orders. Plaintiffs are correct that Labor Ready touts as one of its "primary competitive advantages" the "[a]bility to fulfill short-term customer orders with short notice." (Dkt. No. 49, Ex. B-1 at 6.) However, Plaintiffs' argument that in-office waiting gave Labor Ready the benefit of quick access to employees is undermined by two uncontroverted facts. First, employees are at all times free to reject assignments. (Dkt. No. 46, Ex. B at 75, Ex. C at 110, Ex. D at 35.) Thus, even a full lobby did not guarantee that Labor Ready would always be able to satisfy its customers' labor demands promptly because nothing obligates the employees to accept any given job. Second, Labor Ready has the option of satisfying its customers' labor demands promptly by delegating assignments to employees who are not physically present at the office. (Dkt. No. 46, Ex. B at 99, Ex. C at

103, Ex. D at 46.) For these two reasons, Labor Ready's ability to guarantee the prompt and continuous delivery of labor to its customers is not dependent on the physical presence of employees in the office.

Plaintiffs also argue that waiting benefits Labor Ready in that it permits Labor Ready to observe the employees prior to dispatch, ensure they are physically and mentally prepared to work, and ensure that they have all the equipment they need for the job. Labor Ready considers its employees "products" that it sells to its customers. (Dkt. No. 50, Ex. A-1, at 51.) Labor Ready implements a "satisfaction guaranteed" policy whereby it promises to "replace any temporary employee within the first two hours if the customer is dissatisfied with the employee for any reason." (*Id.* at p. 52.) Thus, Labor Ready has a strong economic and reputational incentive to ensure that its employees were well-equipped and well-prepared to meet the demands of its customers. To some extent, pre-dispatch waiting seems to allow Labor Ready to do just that. Branch managers were instructed to "focus on [employees'] observable characteristics" when delegating assignments in accordance with the best-fit policy, and to make sure that employees had a thorough understanding of the job requirements and Labor Ready's expectations prior to dispatch. (Dkt. No. 50, Ex A-1 at 50.) These instructions would be difficult to carry out if the employee is not present, and in this sense the employee's physical presence may provide some benefit to Labor Ready. However, Labor Ready's ability to observe the preparedness of its employees ends immediately after dispatch, when employees are free to leave the dispatch office and to do whatever they wish.

13

Because Labor Ready does not restrain the employees' free will following dispatch, Labor Ready cannot guarantee that the employee will arrive at the customer's location on time and ready to work. Dispatch occasionally occurs up to a full day prior to the start of the job, and in these cases a verification that an employee was prepared to work at dispatch says little to nothing about whether an employee will still be prepared at the start of the job.

Even assuming an employee's preparedness at dispatch can accurately forecast whether the employee will be prepared at the start of the job, the Court holds that the preparation rituals performed by Labor Ready prior to dispatch benefit the employees as much, if not more, than Labor Ready. Customers have a right to reject employees that are not fit to the task. If an employee is rejected, the employee generally is not paid.[5] The measures taken by Labor Ready while employees waited pre-dispatch—observing employees' physical condition, explaining job descriptions, and verifying employees were well-equipped—all decrease the likelihood that the employee will be rejected. Thus, to the extent these measures benefit Labor Ready by allowing it to deliver satisfactory employees, the measures also greatly benefit the employees themselves.

*5. Conclusion*

Time Plaintiffs spent waiting in the Labor Ready dispatch office prior to the start of an assignment was predominately for the benefit of Plaintiffs, not Labor Ready. Labor

---

[5]At oral argument, Labor Ready's counsel explained to the Court that, if an employee was rejected because the job was cancelled, the employee might still be paid by Labor Ready for the inconvenience.

Ready offered Plaintiffs the unique option of being able to work only when they wanted to work, and to accept only the types of jobs they wanted to accept. As an incident of this arrangement, however, Plaintiffs were occasionally required to appear at the Labor Ready office proclaiming their desire to work. Despite the fact that Labor Ready was able to use Plaintiffs' wait time to ensure employees were prepared to work, the Court is convinced that the wait time was overwhelmingly for the benefit of Plaintiffs. No reasonable fact finder could determine otherwise. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Labor Ready is entitled to summary judgment on Plaintiffs' claim that they should have been compensated for time spent waiting prior to the start of an assignment.

## B. Travel Time

Generally, the Portal-to-Portal Act, 29 U.S.C. § 254(a), requires employers to pay employees only when they are engaged in "principal activities of employment," and not those activities that are considered "preliminary or postliminary" to the principal activities. Travel time is generally not considered a principal activity of employment. 5 C.F.R. § 551.422(b) ("An employee who travels from home before the regular workday begins and returns home at the end of the workday is engaged in normal 'home to work' travel; such travel is not hours of work."). There are, however, certain exceptions to this rule. First, travel time may be a principal activity of employment if it is "an indispensable part of performing one's job" rather than "ordinary home to work travel which is a normal incident of employment." *Vega v. Gasper*, 36 F.3d 417, 424 (5th Cir. 1994) (quoting 29 C.F.R. § 785.35); *see also* 29 U.S.C.

§ 254; *IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005); *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956). Second, even if the travel itself is not an indispensable part of performing one's job, travel time is compensable if it "occur[s] after the employee commences to perform the first principal activity on a particular workday and before he ceases the performance of the last principal activity on a particular workday." 29 C.F.R. § 790.6(a); *see also Jordan v. IBP, Inc.*, 542 F. Supp. 2d 790, 800 (M.D. Tenn. 2008) ("Thus, preliminary and postliminary activities are compensable under the FLSA, in spite of the Portal-to-Portal Act, so long as they occur after the workday has begun and before it has ended."); 29 C.F.R. § 790.7(c) (noting that the limitation on the compensability of travel does not "include travel from the place of performance of one principal activity to the place of performance of another, nor does it include travel during an employee's regular working hours."); 29 C.F.R. § 785.38 ("Where an employee is required to report at a meeting place to receive instructions or to perform work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work . . . ."). This is known as the "continuous workday" rule. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 28 (2005). Plaintiffs claim that travel time to a customer's location at the start of the workday, as well as travel time from the customer's location at the end of the workday, fall within both exceptions to the general rule that travel time is not compensable.

*1. Travel to the Customer's Location*

The evidence indicates that sometimes employees travel to a job site from home, and sometimes employees travel to a job site from a Labor Ready dispatch office. It is first important to establish that, regardless of whether an employee departs from home or from a Labor Ready office, travel time to the customer's location is not compensable as part of the continuous workday rule. Plaintiffs' argument that travel time is compensable as part of the continuous workday rule hinges entirely on Plaintiffs' argument that pre-dispatch waiting time is the start of the workday, an argument that the Court rejected above.

Nor is travel time compensable as an indispensable part of the employee's principal activity of employment. Plaintiffs seem to argue that travel to the customer's worksite is an indispensable part of employment because employees occasionally carry "paperwork," such as the work ticket, from home or from the dispatch office to the customer's location. (Dkt. No. 49, Pl.'s Resp. at 23.) Courts have held that travel may be considered an indispensable activity of employment if the employees are required to transport equipment that is essential to the performance of the job. *See Smith v. Aztech Well Servicing Co.*, 462 F.3d 1274, 1285-90 (10th Cir. 2006); *Sec'y of Labor v. E.R. Field Inc.*, 495 F.2d 749, 751 (1st Cir. 1974); *DA&S Oil Well Servicing, Inc. v. Mitchell*, 262 F.2d 552, 554-55 (10th Cir. 1958); For example, when employees of an oil and gas well servicing company transport equipment "without which well servicing could not be done," the travel is an indispensable part of the principal activities. *DA&S Oil Well Servicing*, 262 F.2d at 555. However, the "paperwork"

17

carried by the employees to the customer's worksite is for administrative and record-keeping purposes only. There is no evidence that any Plaintiff was ever required to transport any equipment "without which [the customer's business] could not be done." Indeed, it is difficult to imagine that Labor Ready would ever be in a position to supply its customers with equipment (not including the employees themselves) that is necessary to the customer's business in light of Labor Ready's limited role as a supplier of labor alone. Even if the evidence did indicate that Labor Ready's customers could not perform their essential business functions without the paperwork provided by Labor Ready's employees, travel to the customer's location is still not an indispensable part of a principal activity of employment because Labor Ready has a variety of options for delivering the paperwork to the customer, such as mail, fax, or delivery of the work ticket by another employee, and Labor Ready sends the work ticket along with the employee out of convenience alone. (*See* Dkt. No. 29, Ex. D Murphy Decl. ¶ 19; Dkt. No. 46, Ex. B p. 169-70.) Thus, the employee's travel is not necessary for the transportation of the paperwork, and travel is merely an incident of employment rather than an indispensable part of employment. *See Aztech Well Servicing Co.*, 462 F.3d at 1290 ("While the plaintiffs occasionally carried equipment and paperwork on behalf of the tool pusher, this was a rare occurrence, and the crews did it as a favor to the tool pusher rather than as an ordinary part of their job.").

*2. Travel From the Customer's Location*

The evidence indicates that after completion of an assignment employees sometimes

travel from a job site to a Labor Ready dispatch office to immediately sign out and collect payment, and sometimes employees travel from a job site to home, and return to a Labor Ready office hours or even days later to sign out and collect payment. Regardless of whether an employee travels from a job site to a Labor Ready office or home, travel time from the customer's location as a matter of law is not an indispensable part of the employee's principal activity of employment. Plaintiffs find it significant that, as with an employee's commute to a customer's worksite, employees often bring paperwork along with them. However, as discussed above, the mere transport of paperwork, which can be transported by other means and is not necessary for the employee to perform the customer's job, is not sufficient to make travel from the customer's location an indispensable part of employment.

Plaintiffs also argue that travel from the customer's location should be compensated pursuant to the continuous workday rule. Since the travel itself is not a principal activity of employment, Plaintiffs need to identify a principal activity of employment that occurs after post-assignment travel time for the continuous workday rule to cover post-assignment travel time. Plaintiffs argue that the sign-out and payment process should be considered a principal activity of employment. As noted in *McComb v. C.A. Swanson & Sons*, 77 F. Supp. 716 (D. Neb. 1948), the legislative history of the Portal-to-Portal Act indicates that "[c]hecking in or out and waiting in line to do so," and "waiting in line to receive pay checks," are both non-compensable postliminary activities. *Id.* at 732; *see also Vega v. Gasper*, 36 F.3d 417, 425 (5th Cir. 1994) ("'[W]aiting in line to receive paychecks' is not a principal activity" (citation

omitted)); 29 C.F.R. § 790.8 ("[A]ctivities such as checking in and out and waiting in line to do so would not ordinarily be regarded as integral parts of the principal activities or activity.")   The sign-out and payment process involved in this case is especially tangential to any principal activity of employment because employees need not report back to a Labor Ready office immediately following an assignment; they may, and often do, wait several days to complete the sign-out and payment process.   Because both an employee's travel from a customer's location and the sign-out and payment process constitute postliminary rather than principal activities of employment, the "continuous workday" ends when an employee goes off the clock at a customer's location. Labor Ready is entitled to summary judgment on Plaintiffs' claim that travel from a customer's location, whether to an employee's home or to a Labor Ready office, should be compensated.

### III. Conclusion

The four factors courts consider to determine whether waiting time is for the primary benefit of the employer and thus should be compensated — the agreements between the parties, whether waiting was requested or required, an employee's free will while waiting, and the actual benefit of waiting to the employer — clearly indicate that Plaintiffs' waiting in the Labor Ready dispatch office prior to the start of an assignment is not compensable. In addition, Plaintiffs' travel time to and from the customer's location is not compensable as either an extension of the continuous workday or a principal activity of employment.   Labor Ready did not violate the FLSA or the MWL by failing to pay Plaintiffs for waiting and

travel time, and Labor Ready is entitled to summary judgment on Plaintiffs' claims. An order

and judgment consistent with this opinion shall be entered.


Dated: June 25, 2010                          /s/ Robert Holmes Bell
                                              ROBERT HOLMES BELL
                                              UNITED STATES DISTRICT JUDGE